

**SO ORDERED**

**SIGNED this 29 day of October, 2024.**

Pamela W. McAfee
United States Bankruptcy Judge

_____

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF NORTH CAROLINA
## FAYETTEVILLE DIVISION

| | |
|---|---|
| **IN RE:** | |
| | **CASE NO.** |
| **GRAND VALLEY MHP, LLC** | **24-03431-5-PWM** |
| DEBTOR | **CHAPTER 11** |
| | |
| **PRAIRIE KNOLLS MHP, LLC** | **24-03432-5-PWM** |
| DEBTOR | **CHAPTER 11** |
| | |
| **ROLLING ACRES MHP, LLC** | **24-03433-5-PWM** |
| DEBTOR | **CHAPTER 11** |
| | |
| **TOP PARK SERVICES, LLC** | **24-03434-5-PWM** |
| DEBTOR | **CHAPTER 11** |
| | |
| **TIME OUT PROPERTIES, LLC** | **24-03435-5-PWM** |
| DEBTOR | **CHAPTER 11** |

## MEMORANDUM OPINION REGARDING
## APPOINTMENT OF CHAPTER 11 TRUSTEE

The court entered an order on October 25, 2024, appointing an interim chapter 11 trustee

in the chapter 11 cases of Top Park Services, LLC (Top Park); Time Out Properties, LLC (Time

Out); Grand Valley MHP, LLC (Grand Valley); Prairie Knolls MHP, LLC (Prairie Knolls); and

Rolling Acres MHP, LLC (Rolling Acres) (collectively, the Debtors) on the motion to convert the

cases to cases under chapter 7 or, in the alternative, for appointment of a chapter 11 trustee, filed

by Northpoint Commercial Finance LLC (Northpoint), D.E. 38.[1] The motion was joined by M&T Realty Capital Corporation (M&T), D.E. 52, and by the chapter 7 trustee of the related case of Toppos, LLC,[2] Case No. 23-02889-5-PWM, D.E. 55. The Debtors filed a Response in Opposition, D.E. 60. At the hearing on the motion, creditor Standard Insurance Company indicated that it supported the motion, and while the United States Bankruptcy Administrator for the Eastern District of North Carolina (the BA) indicated at the commencement of the hearing that he had no position on the motion, he informed the court at the conclusion of the evidence that he joined in the request for appointment of a trustee.

A hearing on the motion was conducted in Raleigh, North Carolina on October 15 and 16, 2024 (the October 2024 Hearing), at the conclusion of which the court took the matter under advisement. On October 25, 2024, the court entered an order finding that Northpoint, as joined by the Topppos Trustee and M&T, met its burden of proving by clear and convincing evidence that appointment of a chapter 11 trustee is appropriate in all five of these cases both for cause and because appointment of a trustee is in the interest of creditors and the estates pursuant to 11 U.S.C. § 1104(a)(1) and (2), and appointing John C. Bircher III as Interim Chapter 11 Trustee. This memorandum opinion sets forth the bases for that ruling.

## JURISDICTION

This bankruptcy court has jurisdiction over the parties and the subject matter of this proceeding pursuant to 28 U.S.C. § 1334. This is a statutorily core proceeding under 28 U.S.C.

---

[1] Unless otherwise indicated, all references to the docket will be to the docket entry numbers in the case of Top Park Services, LLC, 24-03434-5-PWM. Many of the referenced documents have been filed in all five cases, but the docket numbers may vary from case to case. References to docket entries in other cases will appear as follows, for example: references to the docket of the Toppos case, Case No. 23-02889-5-PWM, are noted as "Toppos D.E. ___."

[2] The court notes that TOPPOS, LLC generally is written in upper-case, and the court ordinarily follows that convention; in this order, however, the court will adopt a lower-case recitation with the single goal of making this lengthy document easier to read.

§ 157(b)(1) that this court is authorized to hear and determine. The United States District Court for the Eastern District of North Carolina has referred this case and this proceeding to this court under 28 U.S.C. § 157(a) by its General Order of Reference entered on August 3, 1984. This proceeding is constitutionally core, and this court may enter final orders herein. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

### FACTUAL BACKGROUND AND PROCEDURAL HISTORY

While the Debtors only recently commenced their respective bankruptcy cases, their integrated business operations and those of their affiliate entities are anything but new to this court. Over the past year, this court has had the opportunity to familiarize itself with the Debtors, their affiliates, and the overall intertwined structure of their operations through the filing of a voluntary petition for relief under chapter 11 of the Bankruptcy Code by Toppos, LLC (Toppos) on October 5, 2023, Case No. 23-02889-5-PWM. Based on this court's extensive history with the Toppos case[3] as well as the evidence presented at the October 2024 Hearing, the court understands the integrated operations of Toppos, the Debtors, and the non-debtor affiliates as follows: Toppos was formed in 2017 for the purpose of holding title to manufactured homes and leasing those homes to 29 affiliate manufactured home parks (the affiliate parks), including Debtors Grand Valley, Prairie Knolls, and Rolling Acres (the Park Debtors). *See* Toppos D.E. 267. As of its petition date, Toppos owned 1,654 manufactured homes located in parks in and throughout North Carolina and Illinois. Toppos's sole source of income consists of monthly rental payments due from the affiliate parks to Toppos. Debtor Top Park manages those rents, along with the leasing operations between the

---

[3] The court has been careful to weigh only the evidence presented at the October 2024 Hearing in its determination of whether to appoint a trustee, but some of the procedural history and dates of record in the Toppos case are relevant to provide context to the prepetition conduct of these Debtors.

3

parks and residential tenants, rent collection and distribution, maintenance of the real estate and individual manufactured homes, and day-to-day operations of Toppos and the affiliate parks.

On the eve of Toppos's bankruptcy filing in 2023, new agreements were signed governing Toppos's leases with the affiliate parks. The new agreements, signed by the same individual on behalf of both parties, provided that the affiliate parks would pay Toppos either $250 (for North Carolina parks) or $350 (for Illinois parks) per month per occupied home owned by Toppos, as opposed to the previous agreement, which provided that the affiliate parks would pay Toppos rent for each Toppos-owned home regardless of occupancy. The new agreements also shifted the financial burden of maintenance and repairs of the manufactured homes from the affiliate parks to Toppos. Top Park is responsible for collecting rents from tenants who lease the manufactured homes from the affiliate parks, paying a portion of those rents to the affiliate parks and the $250 or $350 per unit rent to Toppos. Top Park also provides all maintenance and repair services, which it then bills back to Toppos with a 100% "markup" of its maintenance and repair expenditures.

As noted, Toppos and the Debtors, together with the other affiliate entities, are part of one business enterprise. Ex. 1.[4] Time Out is the "parent" corporation of most of the affiliate parks, including the Park Debtors. *Id.* Neil Carmichael Bender, II is the 100% beneficial owner of Toppos, the Debtors, and all of the non-debtor affiliate entities. With few exceptions, and as described further below, all of the entities operate under one cash management system controlled by Top Park.

Mr. Bender testified that he first became involved in the mobile home park business in December 2017. He initially purchased several existing parks using personal funds, with the intention of improving the condition of the parks and then seeking long-term financing. Because

---

[4] Unless noted otherwise, references to exhibits are to the exhibits offered and admitted into evidence at the October 2024 Hearing.

the lenders willing to finance the real estate on which the parks sat did not wish to lend against the existing mobile homes, Toppos was created to hold title to the mobile homes. The mobile homes were transferred to Toppos, creating instant equity in Toppos. Thereafter, the real estate financing and the chattel financing for new mobile homes were handled separately by different lending institutions.

Initially, 21st Mortgage provided the financing for the mobile homes acquired by Toppos[5] and then leased to the affiliate parks, including the Debtor Parks. As of the Toppos filing date, 21st Mortgage held a claim in excess of $5 million. *See* Toppos Claim No. 6-1. At some point, Northpoint also provided chattel financing to Toppos, eventually becoming the largest lender with a claim of over $20 million as of the filing of the Toppos case. *See* Toppos Claim No. 9-2. Northpoint's debt is guaranteed by all or substantially all of the affiliate entities, including the Debtors and Mr. Bender individually. Toppos also financed the purchase of mobile homes through GreenState Credit Union (which held a claim in excess of $12 million as of the Toppos petition date, *see* Toppos Claim No. 7-1) and CHC TN, LLC (with a claim of nearly $6 million as of the Toppos petition date, *see* Toppos Claim No. 8-1).

At the same time, separate lenders hold the mortgages on the real estate on which the affiliate parks are located. M&T holds the liens on the Debtor Parks' real estate, as well as other parks located in Illinois. M&T's claim arises from a note dated May 26, 2022, and the outstanding balance exceeds $26 million. *See* D.E. 52. The M&T obligation, which went into default in June 2023 and matured on November 1, 2023, is also guaranteed by Mr. Bender. *Id.* Other real estate lenders holding the mortgages on non-debtor affiliate parks include Wilmington Trust, National

---

[5] The mobile homes were initially purchased by a different affiliate entity with a dealership license and then transferred to Toppos when titles were issued, but that distinction was not discussed at the October 2024 Hearing and is not relevant to the matter before the court.

5

Association; Standard Insurance Company; Red Fox Capital US; GreenState Credit Union; and Federal National Mortgage Association (Fannie Mae).[6]

Soon after Toppos commenced its bankruptcy proceeding, a hearing on an emergency motion to use cash collateral was conducted on October 18, 2023 (the October 2023 Hearing). At the October 2023 Hearing, Toppos projected that its plan for the case was to liquidate the affiliate parks and mobile homes as operating parks, and that a broker and possibly a Chief Restructuring Officer should be in place to determine the best strategy for sales of the 29 parks, acknowledging that an independent party needed to be retained. *See* October 18, 2023 Hearing T'script, Toppos D.E. 45 at 7. At a hearing on December 6, 2023, there was further discussion about the appointment of a neutral third party, whether that be a Chief Restructuring Officer or a trustee, with the court noting that it was considering appointing a trustee *sua sponte*. The court recessed that hearing to reconvene on December 12, 2023. On December 11, 2023, Northpoint filed a motion to appoint a chapter 11 trustee in the Toppos case, reiterating its concern that the common ownership and control of Toppos and its affiliates created irreconcilable conflicts of interest. Toppos D.E. 82. In the days between the hearing dates, Toppos consented to the appointment of a trustee, and the court entered a consent order appointing John C. Bircher, III as chapter 11 trustee (the Toppos Trustee) on December 12, 2023. Toppos D.E. 83.

The Toppos Trustee attempted to generate sales of operating parks, but ultimately was successful only with one transaction while the case remained in chapter 11 – a sale of the mobile homes in four affiliate parks to Red Fox, which held the real estate liens on the parks. *See* Toppos D.E. 161. All of the chattel lenders, including 21st Mortgage and Northpoint, obtained relief from the automatic stay to repossess the manufactured homes in the Toppos case, with 21st Mortgage

---

[6] Most of these lenders have recently sought and obtained orders appointing receivers for the affiliate parks obligated on their loans.

first obtaining relief as to vacant homes in January 2024, *see* Toppos D.E. 129, and with 21st Mortgage and Northpoint obtaining relief with respect to all collateral pursuant to a consent order for use of cash collateral that provided for stay relief if the Toppos Trustee did not have asset purchase agreements in place by a date certain, and for stay relief thereafter whether or not sales were imminent. *See* Toppos D.E. 177. CHC TN and GreenState also obtained stay relief in June 2024, Toppos D.E. 205; 208. 21st Mortgage filed a motion to convert the case on April 1, 2024, Toppos D.E. 172. On April 30, 2024, the court entered an order converting the Toppos case to one under chapter 7 and appointing Mr. Bircher as the chapter 7 trustee. Toppos D.E. 186. The Toppos Trustee described his post-appointment actions and interactions in his testimony, as detailed below.

As relevant to these Debtors, the Toppos Trustee filed a motion for substantive consolidation of all of the affiliate entities on July 18, 2024, contending that the business affairs of Toppos, the Debtors, and the other affiliates are so entangled that they operated prepetition as a single entity for all practical purposes; that no corporate formalities were observed between the entities; and that the parties had unity of ownership under Mr. Bender. Toppos D.E. 229. At the request of the parties, the court extended the deadlines to respond to the motion and imposed limited informal discovery deadlines. Toppos D.E. 264. Some of the real estate lenders, including M&T, consented to the substantive consolidation motion, while others, as a result of state court orders appointing receivers for some of the affiliate park entities, entered stipulations with the Toppos Trustee to exclude those affiliates from the motion for substantive consolidation. Some of the affiliate parks in Illinois, as well as several in North Carolina, remained subject to the motion as of the scheduled hearing date of October 1, 2024,[7] although the proceedings were stayed as to

---

[7] Because of the Debtors' bankruptcy filings and various agreements between the parties, the motion for substantive consolidation has not yet been heard by the court.

the Debtors by their chapter 11 filings. None of the affiliate entities filed a response to the motion to substantively consolidate.

Meanwhile, the Toppos Trustee also filed a motion for turnover on August 29, 2024, seeking payment of rents due to Toppos from the affiliate parks and collected by Top Park for the month of July. Toppos D.E. 267. A hearing on that motion was conducted on September 5, 2024; at that hearing, the court was advised that some of the affiliates were planning to file chapter 11 petitions in Florida. On September 17, 2024, the Toppos Trustee filed an adversary proceeding, *Bircher v. Top Park Services, LLC, Time Out Properties, LLC, Cedarbrook Estates MHP, LLC, Grand Valley MHP, LLC, Maple Creek MHP, LLC, Prairie Knolls MHP, LLC, and Rolling Acres MHC, LLC (In re Toppos, LLC)*, Adv. Pro. No. 24-00114-5-PWM, seeking turnover of the unpaid rents as well as injunctive relief and substantive consolidation of the affiliate defendants. The court entered an *ex parte* temporary restraining order on September 18, 2024, AP D.E. 9, directing the defendants not to disburse any assets without prior written approval of the Toppos Trustee or an order from the court, and set a hearing on the motion for preliminary injunction for September 23, 2024.

The Debtors in the instant cases[8] filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Florida on September 20, 2024, notwithstanding Toppos's pending affiliate case in this district. The Toppos Trustee filed a motion to transfer venue on September 21, 2024, Toppos D.E. 289, which the court set for hearing on October 2, 2024 (the date on which the motion for substantive consolidation was scheduled to be heard).[9] This court conducted a status conference in the adversary proceeding on

_____

[8] Of the seven defendants in the AP, two affiliate parks – Cedarbrook Estates and Maple Creek – did not file petitions for bankruptcy relief.

[9] The hearing was later rescheduled to October 1, 2024.

September 23, 2024, to consider the effect of the bankruptcy filing of some, but not all, of the defendants on the temporary restraining order entered the prior week. At that hearing, Northpoint advised the court that it intended to make an oral motion to appoint a trustee if the motion to transfer venue was allowed. On September 25, 2024, pursuant to Federal Rule of Bankruptcy Procedure 1014(b), this court entered an order directing the Debtors not to proceed in the Florida bankruptcy court, citing concerns that allowing the Debtors' cases to proceed in Florida could cause irreparable harm to the Toppos bankruptcy estate and its creditors, and was virtually certain to cause disruption and inconsistencies with the proceedings before this court. Toppos D.E. 297.

The court convened the hearing on the motion to transfer venue and the motion for substantive consolidation as to the affiliates that were neither stipulated "out" of the motion nor newly in bankruptcy on October 1, 2024. The Debtors consented to transfer of venue to this district, and the parties agreed to continue the hearing on substantive consolidation for at least 30 days. The court set a hearing for the use of cash collateral on the agreed date of October 15, 2024, and the Debtors also agreed to file their schedules on October 15, 2024. *See* Toppos D.E. 321.

Meanwhile, Northpoint filed its motion to convert or in the alternative to appoint a chapter 11 trustee on October 3, 2024, and sought an expedited hearing on that motion on the existing hearing date of October 15, 2024, which was allowed. In its motion, Northpoint raised many of the same bases for appointing a chapter 11 trustee for the Debtors as it had in the Toppos case, describing the Debtors' management structure as "hopelessly conflicted" and contending that the Debtors would not act in a manner consistent with the fiduciary duties owed to Northpoint and other creditors. D.E. 38. Northpoint's motion also asserted that the affiliate entities controlled by Mr. Bender have not observed corporate formalities in the dealings between the Debtors and Toppos, and that the eve-of-bankruptcy agreement between Top Park and Toppos was to the

detriment of creditors and to the benefit of affiliate entities remaining outside of bankruptcy. D.E. 38. In his joinder of Northpoint's motion, the Toppos Trustee raised concerns that current management of the Debtor Parks has failed to maintain the manufactured homes in those parks, leaving them in significant disrepair and subject to vandalism, causing continuing damage to all of the affiliate Debtors' estates. D.E. 55. The Toppos Trustee further contends that Mr. Bender operates the affiliate entities in a manner benefitting himself and to the detriment of the Debtors, affiliates, and the tenants in the parks, as well as the creditors of all of the affiliates, as shown by Mr. Bender's moving money from the parks to Top Park to enable Top Park to pay his $200,000 salary and make other distributions for his benefit. *Id.* In its joinder, M&T maintains that "the Debtors' conflicted and incestuous management structure has been exploited by Bender to enrich himself at the creditors' expense." D.E. 52 at 12. M&T contends that a trustee is needed to manage the Debtors' liquidation to ensure that the estates receive their fair share of value from any sale of the Debtors' assets and to investigate claims against the affiliates and insiders. *Id.*

In response, the Debtors contend that the motion to convert or appoint a trustee is premature, given that their petitions were filed only on September 20, 2024, and that the shortened notice for the October 15 hearing prejudiced their ability to prepare. They also maintain that they have been busy with cash collateral motions, the motion to transfer venue, and preparation of schedules. While it is true that the Debtors only recently filed their respective bankruptcy petitions, they were aware as early as September 5, 2024 from comments made in open court that a filing in Florida would likely prompt a motion to transfer venue. When they consented to the transfer of venue, the Debtors agreed to file their schedules on October 15, 2024 – notwithstanding that schedules are by statute to be filed *with* the petition, so the October 15 date provided the Debtors with a substantial extension. The Debtors were also on notice at least as early as September 23,

10

2024 that Northpoint intended to seek conversion or appointment of a trustee immediately upon the transfer of the cases to this district, should the transfer be allowed. Further, the factual and evidentiary issues raised by the motion to convert are nearly identical to those that would have been relevant to the motion for substantive consolidation, which has been pending since July. The Debtors set themselves on this expedited (and expensive) path by choosing to file in another jurisdiction knowing they would have to defend a motion to transfer venue, and by choosing not to prepare their schedules until after their petitions were filed, while knowing that their filings would be vigorously contested. In light of this background, the court cannot extend sympathy in response to the Debtors' assertions that any aspect of their cases has been rushed or an imposition on them.

Substantively, the Debtors maintain that they have complied with every obligation postpetition and have been model stewards of their estates – not even spending the funds authorized by the court to have been spent pursuant to their cash collateral motions. They also contend that there are justifications for the prepetition business operations about which the moving parties complain, that there are no irreconcilable conflicts, that they have a path to reorganization for these Debtors, and that they should be given an opportunity to propose and confirm chapter 11 plans. The court undertook full and careful consideration of these substantive arguments, and for the reasons discussed below, finds in its discretion that a trustee must be appointed.

## LEGAL STANDARD

Section 1112 of the Bankruptcy Code governs the conversion or dismissal of a chapter 11 case. Section 1112(b) states that the court may convert a case under chapter 11 to chapter 7 or dismiss the case "for cause." 11 U.S.C. § 1112(b). "Cause" under this section includes substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of

rehabilitation, as well as gross mismanagement of the estate. 11 U.S.C. § 1112(b)(4)(A)-(B). In determining whether "cause" exists to convert or dismiss a case, "the court must conduct a fact-specific inquiry of the debtor's ***post-petition*** circumstances, and may exercise its discretion." *In re Paterno*, 511 B.R. 62, 66 (Bankr. M.D.N.C. 2014) (emphasis in original). The Debtors maintain that they have complied with all of the bankruptcy rules postpetition, and in fact have not spent even the funds that have been authorized by the court, such that conversion is not authorized by statute. Northpoint contends that the court is not limited to consideration of only postpetition conduct and instead can (or, more specifically, should) consider all established facts pertaining to the Debtors' management's post- and prepetition conduct, on which basis it asserts that conversion is appropriate. Because the court in its discretion finds that appointment of a trustee is the more appropriate remedy to consider in this case, the court need not determine whether prepetition conduct may be considered in conjunction with a motion to convert.

The court turns to whether appointment of a trustee is warranted under § 1104, which provides:

(a) At any time after the commencement of the case but before confirmation of a plan, on request of a party in interest or the United States trustee, and after notice and a hearing, the court shall order the appointment of a trustee—

(1) for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause, but not including the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor; or

(2) if such appointment is in the interest of creditors, any equity security holders, and other interests of the estate, without regard to the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor.

11 U.S.C. § 1104. The moving party bears the burden of proof, and must demonstrate by clear and convincing evidence that appointment of a trustee is warranted. *In re Tanglewood Farms, Inc.*, No.

10-06719-8-JRL, 2011 WL 606820, at *2 (Bankr. E.D.N.C. Feb. 10, 2011); *see also Eurospark Indus., Inc.*, 424 B.R. 621, 627 (Bankr. E.D.N.Y. 2010).

Chapter 11 debtors are generally permitted to remain in control of their business operations and assets. *Eurospark*, 424 B.R. at 627. While discretionary, the appointment of a trustee is "an extraordinary remedy, and there is a strong presumption in favor of allowing the debtor to remain in possession." *Tanglewood Farms*, 2011 WL 606820, at *2. However, "[t]he willingness of Congress to leave a debtor-in-possession is premised on an expectation that current management can be depended upon to carry out the fiduciary responsibilities of a trustee." *In re V. Savino Oil & Heating Co., Inc.*, 99 B.R. 518, 526 (Bankr. E.D.N.Y. 1989). A debtor in possession is viewed as a *de jure* trustee, and holds its powers in trust for the benefit of creditors. *Id.* at 524-525.

While the statute speaks to gross mismanagement and fraud, those are not the only grounds for "cause" under §1104(a)(1). *In re Concord Coal Corp.*, 11 B.R. 552, 553 (Bankr. S.D.W. Va. 1981); *see also In re Adelphia Commc'ns Corp.*, 336 B.R. 610, 656 (Bankr. S.D.N.Y.), *aff'd*, 342 B.R. 122 (S.D.N.Y. 2006). The court has discretionary authority to determine whether conduct rises to the level of "cause" under § 1104(a)(1). *Concord*, 11 B.R. at 553. This discretion governing the appointment of a chapter 11 trustee in § 1104(a)(1) can be attributed to Congress's intent to ensure that fraud by former management does not automatically require the installment of a trustee where a debtor had taken corrective action. *Id.* (citing 5 Collier on Bankruptcy ¶ 1104.01 at 1104-20 (15th ed. 1979)). Additionally, "some degree of 'mismanagement' is assumed for any debtor compelled to seek protection of the Bankruptcy Code." *Id.*

Section 1104(a)(2) provides for appointment of a trustee where appointment is in the interest of creditors, any equity security holders, and other interests of the estate. Compared to § 1104(a)(1), which requires a specific finding of cause, § 1104(a)(2) "envisions a flexible

standard." *In re Marvel Ent. Grp., Inc.*, 140 F.3d 463, 474 (3d Cir. 1998). The court may use its broad equitable powers to engage in a cost-benefit analysis to determine whether appointment of a trustee is in the best interest of creditors. *In re L.S. Good & Co.*, 8 B.R. 312, 314 (Bankr. N.D.W. Va. 1980). This analysis includes evaluating whether conflicts of interest exist that might prevent the current management from making impartial investigations and decisions that may be required should there be inter-company claims on behalf of the debtor. *See id.* at 315. Conflicts of interest may also call into question whether the debtor in possession can remain loyal to the debtor's goal of rehabilitation, further justifying the need for a trustee. *See Concord*, 11 B.R. at 554. The analysis is fact-driven, and should aim to balance the advantages and disadvantages of appointing a trustee, keeping in mind that doing so is well-established to be an extraordinary remedy. *Adelphia*, 336 B.R. at 658.

With these principles in mind, the court turns to the evidence before it.

## EVIDENCE PRESENTED AND FINDINGS OF FACT

The following individuals testified at the October 2024 Hearing:

Neil Carmichael Bender, II, the Chief Executive Officer and beneficial owner of the Debtors and affiliate entities;

Austin Shapiro of M. Shapiro Real Estate Group, a management company serving as receiver of some of the affiliate parks; and

John C. Bircher, III, the Toppos Trustee.

As background, Mr. Bender testified that there were three primary causes of the deteriorating financial condition of the overall enterprise:

First, according to Mr. Bender, the eviction moratoria imposed during the Covid pandemic left Top Park unable to evict tenants who failed to pay their rent. With no ability to evict, Top Park also was unable to inspect the manufactured homes. When the moratoria were lifted, Top Park

14

discovered that not only were tenants not paying rent, but they had vandalized the homes and stolen appliances and copper wire out of the walls. This left the homes in substantial need of repair and remodeling before they could be re-leased, leaving occupancy rates at all-time lows.

Second, Mr. Bender contends that Northpoint defaulted on key terms of its loan agreements, leaving Top Park and the affiliates in an impossible cash flow position. Specifically, Mr. Bender understood that Northpoint's financing arrangement would mirror that already in place with 21st Mortgage, whereby Toppos (or the purchasing entity) would borrow funds to purchase new mobile homes and would hold those on a "floor plan" financing arrangement until the home was set and occupied. If a particular home stayed on the floor plan longer than a specified term, a principal curtailment would be paid. Once the home was moved to permanent financing, 21st Mortgage would refund any curtailment that had been paid and finance the full purchase price of the home. Northpoint, contrary to Mr. Bender's expectation, refused to refund the curtailment payments and then financed only the principal balance owed, minus any paid curtailment. For a variety of reasons, homes were staying on the floor plan longer than expected, causing higher curtailment payments. When those payments were not refunded, Top Park found itself with negative cash reserves.[10]

Third, Mr. Bender contends that the loss of control of Toppos to the Toppos Trustee created problems when the Toppos Trustee directed Top Park to stop re-leasing unoccupied homes. Mr. Bender testified that the vacant homes left the entities with a $40,000 loss in revenue for approximately five months. The Toppos Trustee disputes that he instructed Top Park not to re-lease homes, and instead required it to make available a certain number of vacant homes to 21st

---

[10] The court understood Mr. Bender to say that this dispute is the subject of litigation in another forum. The court is aware of litigation pending between Northpoint, Mr. Bender, and many affiliate companies including the Debtors in the United States District Court for the Northern District of Georgia, as that litigation was the subject of a motion in Toppos, Toppos D.E. 66. There is no litigation with Northpoint listed in any of the Debtors' Schedules.

Mortgage after the stay was lifted and 21st Mortgage began recovering its collateral. While not part of Mr. Bender's testimony, a consent order for the use of cash collateral entered on April 8, 2024, while the case was still in chapter 11, sheds some light on the issue, as it provided:

> (1)(f) When any manufactured home owned by the Debtor becomes vacant (unoccupied), the Debtor and its non-debtor affiliates shall secure and protect, but not make use of, allow someone to occupy, or enter a new lease for that manufactured home without first notifying the Trustee and any lienholder on that home of the vacancy and securing the Trustee's written approval for the proposed use of the home. Such approval may be requested as frequently as once per week for multiple manufactured homes.

Toppos D.E. 177. However, there was no evidence that any request to lease a vacant home was denied, other than to reserve a set number for 21st Mortgage to recover. It was also undisputed that the Toppos Trustee encouraged the homes to be re-leased and occupancy increased at least in July 2024, three months after entry of the consent order.

Against this backdrop, the other evidence and testimony presented at the October 2024 Hearing further illuminated the Debtors' operations and hopes for reorganization.

### Operational Structure of the Affiliated Entities

Mr. Bender's testimony corroborated the summary set forth at the beginning of this order describing Top Park's role in the integrated operations of all of the affiliate companies, including the Debtors. More specifically, Top Park is the only entity with employees. It holds the only bank accounts and manages the collection of all income and the payment of all obligations on behalf of all affiliate entities, maintaining ledger entries to account for each transaction. Prior to September 20, 2024, the management team consisted of Mr. Bender as Chief Executive Officer, Mark King as Chief Legal Officer and Chief Operating Officer, and a Chief Information Officer whose name is unknown to the court. Mr. King and the CIO were separated from the companies as of September

20, 2024, leaving Mr. Bender as the sole executive. Prior to the departure of Mr. King and the CIO, Mr. Bender and Mr. King were the only recognized officers.

There are management agreements between Top Park and Time Out for certain properties for which Time Out is the parent company of the affiliate parks, *see, e.g.*, Ex. 4, and according to Mr. Bender, there are management agreements that cover other affiliate parks that are not in evidence. Mr. Bender testified that those agreements vary and are often updated, but he could not testify as to the terms of any of the specific agreements. There are also lease agreements between the various affiliate parks and Toppos, pursuant to which the affiliate parks lease the Toppos-owned mobile homes from Toppos (which are, in turn, leased by the parks to the residential tenants). All of the agreements between the affiliate entities are signed by the same person for both parties – in many cases by Mr. King, the former Chief Legal Officer, and in some cases by Mr. Bender. In short, all transactions flow through Top Park, now with Mr. Bender as the sole and controlling manager and, ultimately, the sole equity holder, negotiating both sides of any agreement.

### Maintenance and Repairs

As the property management company, Top Park provided – or contracted with providers of – maintenance services, including repairs to the Toppos-owned mobile homes and general property maintenance in the affiliate parks. The day before the Toppos bankruptcy filing, the 2021 written agreements governing the leases between Toppos and the affiliate parks were revised, with two key changes: first, Toppos would only be paid rent for homes that were occupied as of the first day of any particular month, and second, Toppos would become responsible for paying maintenance and repair costs, including any major renovation of the mobile homes. Mr. Bender contended that these amendments were made to reflect the actual operations of the companies.

Other evidence presented, however, shows that Top Park (or the specific affiliate park) was previously responsible for maintenance costs, with no repair or maintenance expense borne by Toppos. *See* Exs. 5, 6 (2022 profit and loss statements for Toppos and Top Park); Exs. A-G (2020-2024 profit and loss statements for the Debtors, showing maintenance costs borne by Top Park and the Debtor Parks, many of which ceased as of October 2023).

Faced with the documentary evidence, Mr. Bender testified that pre-Covid, the maintenance costs were insignificant and major renovations of the new homes would not be expected for 5-7 years, by which time Toppos would have built up some financial cushion. With the vandalism and destruction of the mobile homes caused during Covid, the timeline for necessary remodeling moved up from the 5-7 years typically expected for mobile home upgrades, and neither Top Park nor the affiliate parks could afford to do it.[11] Mr. Bender admitted that he "did not know" if anyone analyzed whether Toppos could afford the maintenance and remodeling costs before changing the terms of the agreements and shifting those financial obligations to Toppos. With respect to the part of the agreement limiting the rental obligation from the affiliate parks to Toppos as to only occupied homes, Mr. Bender testified that in the past, there were few vacancies so there was no need to account for occupied vs. unoccupied homes.

At the same time, Top Park was passing through maintenance and repair costs at a 100% markup to Toppos and, where applicable, to the affiliate parks. An exemplary invoice from Top Park to an affiliate park showed one line item for "labor charges for home and park maintenance," and one line item for "labor markup for home and park maintenance" in an amount equal to the first line – in other words, a 100% markup of actual costs. Ex. 9. Mr. Bender testified that as the

---

[11] There was no explanation of how the organization intended to pay for renovations of the older homes that were transferred to Toppos when the parks were initially purchased, which would have been needed sooner than 5 years after the formation of Toppos.

management company for the affiliate parks, Top Park created work orders for services rendered, and sent an invoice for services and the markup to the respective affiliate park. There was no one on the receiving side of the work orders to determine what work would or would not be done; it was all handled internally at Top Park. Mr. Bender further testified that a markup of 100% was typical for Top Park, and in line with or better than industry standards. He further testified that Top Park has overhead costs, such as vehicles, supervision, and workers' compensation insurance, that could only be recouped through the markup.

The Toppos Trustee, Mr. Bircher, testified that after he was appointed to oversee Toppos, he received only spreadsheets from Top Park indicating the cost of maintenance, rather than specific invoices, and he could not ascertain what services were being performed. He further testified that the rental income simply did not support the maintenance costs being charged to Toppos, but that his efforts to renegotiate the arrangement were unsuccessful. His analysis showed that the companies had operated consistent with the 2021 agreements, and even then, there was insufficient income to pay Toppos's secured obligations. In short, according to the Toppos Trustee, there was no way to service the Toppos debt while paying the maintenance and repair obligations.

Mr. Shapiro, who has managed mobile home parks across the country for 12 years, testified that his company generally charges a management fee of 5% of gross revenue, and does not mark up maintenance invoices or charge back expenses, such as travel, to the parks it manages. Mr. Shapiro also testified, based on his personal experience managing "a few hundred" parks in 40 states, that while some management agreements include markups, he has never seen any higher than 40-50 percent of actual cost.

The court also observes that Top Park collected the rents from the tenants and allocated a portion to the affiliate parks and a portion to Toppos, but there was no evidence regarding the

disposition of any rental income that exceeded the payments to the affiliate parks and Toppos – presumably, those funds stayed in the Top Park operating account. Similarly, the property management agreement submitted into evidence – which does not govern any of the Debtor Parks – provides for a percentage management fee to Top Park. Ex. 4. The Top Park profit and loss statements also show management fees as income to Top Park. Ex. A. Based on the foregoing, it is not at all clear to the court that a necessary source of operating/overhead revenue to Top Park is the 100% markup of the maintenance costs, and it is clear that the changes in the Toppos lease agreements do not, in fact, document how the parties were operating before those agreements were executed.

**Property Condition**

Mr. Shapiro was retained by M&T in late 2023 to inspect the Debtor Parks and other parks in Illinois on which M&T holds the mortgage. He testified that he visited the parks in early November or early December 2023, and he took a number of photos. A subset of those photos was admitted into evidence. Ex. 13. Mr. Shapiro testified that many of the photos showed new mobile homes that had been delivered to the parks but could not be occupied because they had not been fully set. Specifically, some were still on their axles and sitting in the street, some were blocked and leveled but not connected to utilities, some had no stairs, some had no skirting or ripped skirting – subjecting the underbelly of the home to the elements. In Grand Valley, tree branches had fallen on a few homes. Mr. Shapiro testified that only 40-50 percent of the homes in the Debtor Parks could be occupied. He also testified that he did not see anyone working at the parks during the 2 ½ days he was on site.

Mr. Shapiro further testified that the cost to "set up" new mobile homes upon delivery could range from $20-30,000. On cross examination, it was suggested that the reason Top Park

did not spend the funds needed to complete the set up was that it had been instructed by the Toppos Trustee not to lease any homes. However, Mr. Shapiro visited the Debtor Parks and took the photos in early November or early December 2023, *before* the Toppos Trustee was appointed. In other words, the reason the homes sat untended in late 2023 remains unknown, but cannot be attributed to the Toppos Trustee.

Meanwhile, Mr. Bircher testified on the topic of maintenance that he received repair bills in the form of spreadsheets (not individual invoices) totaling $300-400,000 per month from Top Park, but at most he received $240,000 in rental income. The change in the Toppos rent structure decreased the rental revenue and increased expenses. The Toppos Trustee testified that as he received statements from Top Park, he could not understand what was being repaired. He had many conversations with Mr. King to try and understand what repairs were being made, but Mr. King responded that it was too difficult to redo how Top Park billed.[12] The Toppos Trustee determined that he needed to preserve cash, and told Top Park that it should file administrative claims for the repairs, which it never did.

**Accounting Practices**

Top Park, as the management company for this entire operation and the holder of the only operational bank accounts, collected funds and paid expenses on behalf of all the affilite parks and Toppos. All funds flowed through Top Park's bank accounts. While some of the affiliate entities have bank accounts, those accounts rarely had substantial sums in them – they were established only where a lender required an account in a borrower's name in which to deposit loan proceeds, and those funds were immediately moved to Top Park. When Top Park paid an expense obligation

---

[12] The accounting method used for billing repairs and maintenance also created issues for the chattel creditors in the Toppos case, as there was no way to trace whether the rental income from, for example, 21st Mortgage's mobile home collateral, was being used to repair or renovate its collateral or, for example, Northpoint's collateral.

of an affiliate entity or collected funds owed to an affiliate entity, an entry was made on the ledgers for the entity in question. If there were insufficient funds in one entity's column, the funds would be moved from another entity and a "due to" or "due from" journal entry would be created. For example, if Top Park performed a repair, it invoiced Toppos and made an entry in the books. If Toppos had insufficient funds in its ledger to cover the invoice, a "due from" entry was made against Toppos, and a "due to" entry was made in favor of Top Park. If the expense required Top Park to disburse funds outside of the organization, it would simply take the funds from whichever affiliated entity had sufficient funds and create a "due to" entry to the funding entity and a "due from" entry for the entity on whose behalf the expense was paid. The Schedules indicate that each of the Debtors have positive intercompany accounts receivable – indicating that the "due to's" exceed the "due from's." *See* Exs. 14-18. Because the Park Debtors have not serviced their debt since May 2023, the court infers that the income credited to the Park Debtors was used to fund other affiliates' expenses, rather than to pay their own debt obligations.

Mr. Shapiro, who became involved in the management of some of the affiliate parks either as a receiver or as management hired by a receiver after he visited the Debtor Parks in November or December 2023, also testified that the central accounting system made his job as receiver for some of the affiliate parks difficult because he could not reconcile the deposits and expenses.

**Creditor Activity**

As referenced above, the real estate lenders for a number of the affiliate parks sought and obtained receivers for the affiliate park entities in North Carolina and Illinois state courts while the Toppos case was pending. Mr. Bender testified that in some instances, the parks agreed to the appointment of the receivers, but in others, the receivers were put into place without notice. Regardless, the fact that nearly all of the non-debtor affiliate parks are in receiverships signals that

all or nearly all of the mortgages are in default. As of the October 2024 hearing, Mr. Bender testified that Top Park was managing only ten affiliate parks (one of which was scheduled for sale shortly after that hearing) – a change from "all of the parks on the right side" of Exhibit 1, a total of 37, one year earlier.

As the secured chattel lender for the Park Debtors, 21st Mortgage filed motions for relief from the automatic stay to repossess its collateral in these cases on October 17, 2024, contending that the manufactured homes have not been maintained in a manner consistent with industry standards and are in substantial disrepair. Grand Valley D.E. 60, Prairie Knolls D.E. 61, Rolling Acres D.E. 56. M&T, the real estate lender for the Debtor Parks, asserts that its loans have been in default since June 2023. With respect to M&T, Mr. Bender testified that all of the rental income for the Debtor Parks was used to pay operational expenses, and there was not enough income to also service the M&T debt. As detailed elsewhere in this opinion, the Debtor Parks were unable to increase occupancy, according to Mr. Bender, because the Toppos Trustee would not pay for maintenance and would not let Top Park re-lease the vacant homes.

The Schedules show that real estate taxes are owed for the Debtor Parks in the amounts of $144,047.66 for Grand Valley, Grand Valley D.E. 57 at 12 Item 2.5, $83,975.37 for Prairie Knolls, Prairie Knolls D.E. 59 at 12 Item 2.4, and $67,879.56 for Rolling Acres. Rolling Acres D.E. 54 at 12 Item 2.4. The Schedules do not indicate for what years the taxes are owed. Mr. Bender testified that he did not know how much was owed for real estate taxes for 2022 and 2023, but he was not surprised that it would exceed $200,000. He also testified that Mr. King would have decided whether or not to pay property taxes.

**Bender Transactions**

As noted, Mr. Bender is the sole remaining executive and the 100% beneficial owner of all of the affiliate entities. Mr. Bender testified that, over time, he has loaned over $40,000,000 to the enterprise, and that at times, Top Park made disbursements to him in repayment of these loans. He did not know whether the companies issued any promissory notes to evidence his loans. The books and records introduced into evidence, however, including the tax returns and Schedules, do not indicate that Mr. Bender "loaned" funds to the entities. Instead, the books reflect "contributions" and "distributions." Mr. Bender failed to distinguish between loans and equity contributions, and likewise failed to distinguish between loan repayment and equity distributions. It was his position that he was entitled to be repaid for his equity contributions (which he called loans) when there were funds available, which in some instances was after receiving permanent financing for a park. Mr. Bender explained his understanding of partnership distribution: until he was repaid for his loans, payments from the company constituted loan repayments and not distributions. After his loan is repaid, he would be paid profit. Accordingly, until he is repaid the full amount he put in, the funds he receives are not what Mr. Bender would characterize as a "distribution."[13]

The K-1s for 2021 and 2022 showed that Mr. Bender received approximately $25 million in disbursements in those tax years. See Ex. 2 (2021 Distribution from Time Out to Mr. Bender of $18,995,000); Ex. 3 (2022 Distribution from Time Out to Mr. Bender of $6,084,628). Those numbers correspond to the "owner distributions" for those years reflected on Exhibits F and G. At the same time, "owner contributions" for the same period totaled approximately $17,307,000, such

---

[13] In some respects, and to a limited extent, this is an accurate rendition of how corporate distributions to equity can work, but this principle generally refers to debt service to outside creditors before a return to equity, not repayment to insiders before repayment of lenders. It is also inconsistent with the tax returns, the Schedules, and the ledger entries submitted as Exhibits F and G, none of which reference loan repayment to Mr. Bender.

that Mr. Bender received a net total of just over $7,772,000 in 2021 and 2022. *See* Exs. F-G. Mr. Bender acknowledged that he alone made the final decision as to who got paid back and when. He testified that he wanted to be repaid so he could buy more parks. This was so even while the companies were struggling, with mortgages and real estate taxes going unpaid.

The evidence established that during this time, and in the face of the challenges created by Covid as described by Mr. Bender, had Mr. Bender left those funds in the companies, the funds could have been used to refurbish and re-lease the vandalized mobile homes, increasing the revenue for all of the affiliate entities. Instead, the companies remained undercapitalized to meet their operating expenses regardless of whether they were servicing their debt. Mr. Bender admitted that the Debtors would not be in their current financial position had he not taken out that $25 million, but also testified that he was "owed that money."

In addition to "loan repayments," Mr. Bender also received reimbursement for expenses. He produced credit card statements showing that he advanced business expenses on his personal account, and he marked out the personal expenses for which he did not seek reimbursement. Ex. H. When questioned about large, lump sum payments to him from Top Park, Mr. Bender testified that Top Park reimbursed him when there were funds available, and that the amounts owed to him still far exceed those payments. On the other hand, the bank statements show that some of Mr. Bender's credit card statements were paid directly by Top Park, and it is not evident where Mr. Bender reimbursed Top Park for the personal expenses charged to those cards.[14] *See generally* Exs. 10-12. The credit card statements also show costs incurred by other individuals who also were authorized users of the cards in question, with some of those expenses being personal (and marked out).

---

[14] The court is not suggesting that Mr. Bender did not reimburse Top Park for his personal expenses, but there was no effort to point the court to those reimbursements.

**Summary of Schedules**

All of the Debtors filed their Schedules after the conclusion of the first day of evidence on October 15, 2024, and Mr. Bender was questioned about the Schedules on October 16, 2024. While Mr. Bender signed the Schedules for each Debtor under penalty of perjury, he testified that the company accountant provided all of the information needed to counsel, and that he reviewed the Schedules "as best he could on his iPhone on the plane" while en route to Raleigh for the October 2024 Hearing. He testified that he did not ask any questions of the accountant or counsel about any of the information on the Schedules and assumed that all of the information was accurate.

Noteworthy items on the Schedules include:

Grand Valley has no cash, and it values its real estate with a book value of $15,660,360.48 and a "current value" of $19,820,000. Ex. 14; Grand Valley D.E. 57 at 3 Item 1, 4 Item 55. It lists Accounts Receivable as an asset with a total value of $93,489.98, *id.* at 5, Item 12, and Intercompany Receivables as an asset with a value of $3,228,149.21. *Id.* at 6, Item 77. Grand Valley lists 21st Mortgage, M&T, and Northpoint as secured creditors. *Id.* at 8-9. Grand Valley does not list Mr. Bender as a creditor. It lists the affiliate parks, Mr. Bender, and Time Out as co-debtors on the 21st Mortgage debt. *Id.* at 26-29. It lists no value provided to insiders within the year prior to filing, *id.* at 36, Item 30, and indicates it is not a member of a consolidated group for tax purposes. *Id.* at Item 31.

Prairie Knolls has no cash, and it values its real estate with a book value of $4,484,199.20 and a "current value" of $9,230,000. Ex. 15; Prairie Knolls D.E. 59 at 3 Item 1, 4 Item 55. It lists Accounts Receivable as an asset with a total value of $13,001.23, *id.* at 5, Item 12, and Intercompany Receivables as an asset with a value of $3,727,875.46. *Id.* at 6, Item 77. Prairie Knolls lists 21st Mortgage, M&T, and Northpoint as secured creditors. *Id.* at 8-9. Prairie Knolls does not list Mr. Bender as a creditor. It lists the affiliate parks, Mr. Bender, and Time Out as co-debtors on the 21st Mortgage debt. *Id.* at 26-29. It lists no value provided to insiders within the year prior to filing, *id.* at 36, Item 30, and indicates it is not a member of a consolidated group for tax purposes. *Id.* at Item 31.

Rolling Acres has no cash, and it values its real estate with a book value of $2,545,877.79 and a "current value" of $7,040,000. Ex. 16; Rolling Acres D.E. 54 at 3 Item 1, 4 Item 55. It lists Accounts Receivable as an asset with a total value of $26,109.50, *id.* at 5, Item 12, and Intercompany Receivables as an asset with a value of $2,891,447.84. *Id.* at 6, Item 77. Rolling Acres lists 21st Mortgage, M&T, and Northpoint as secured creditors. *Id.* at 8-9. Rolling Acres does not list Mr. Bender as a creditor. It lists the affiliate parks, Mr. Bender, and Time Out as co-debtors on the 21st Mortgage debt. *Id.* at 26-29. It lists no value

provided to insiders within the year prior to filing, *id.* at 36, Item 30, and indicates it is not a member of a consolidated group for tax purposes. *Id.* at Item 31.

Time Out has $1,444.18 in cash and $617,811.03 in deposits and escrows. Ex. 17, Time Out D.E. 55 at 3-4, Items 1 and 9. Time Out lists an asset of "acquisition and closing costs" in the amount of $906,419.08, *id.* at 5 item 64, that Mr. Bender could not identify. Time Out listed Intercompany Receivables in the amount of $38,799,342.24. *Id.* at 6, Item 77. Time Out lists 21st Mortgage, CHC TN, LLC, GreenState Credit Union, M&T, and Northpoint as secured creditors. *Id.* at 8-9. Time Out does not list Mr. Bender as a creditor. It lists the affiliate parks, and Mr. Bender, as co-debtors on the 21st Mortgage debt, and lists Top Park as a co-debtor only for two debts to individuals. *Id.* at 28-31. It indicates it is not a member of a consolidated group for tax purposes. *Id.* at 41, Item 31. Time Out does provide a list of transfers made to insiders. *Id.* at 42-47, Exhibit A.

Top Park has $784,745.82 in its bank accounts. Ex. 18, Top Park D.E. 62 at 3, Item 3. It lists accounts receivable in the amount of $2,821,003.94, *id.* at 4, Item 12, and Intercompany Receivables in the amount of $30,637,612.23. *Id.* at 7, item 77. It lists "startup expenditures and closing costs" as an asset with a value of $1,000,626, *id.* at 6, item 64, but Mr. Bender could not explain what this is. Top Park lists 21st Mortgage and Northpoint as secured creditors. *Id.* at 12. Top Park lists Mr. Bender as a priority unsecured creditor for wages owed in the amount of $8,746.96, *id.* at 16, line 2.10, and as a general unsecured creditor with a claim in the amount of $19,310.31. *Id.* at 30, line 3.86. All of the affiliate parks, Time Out, and Mr. Bender are listed as co-debtors to 21st Mortgage, with a few co-debtors listed for some individual claims. *Id.* at 42-46. Top Park did provide a list of transfers made to insiders, *Id.* at 60-62 (Items 4 and 30 Exhibit B), which mirrors the October 2024 Hearing Exhibit F and includes only transfers made in 2021-2022.

The Top Park Statement of Financial Affairs shows nine payments ranging from $10-30,000 to Mr. Bender within the 90 days prior to the petition date, most of which are noted as AMEX reimbursement. D.E. 62 at 56-59 (Item 3 Exhibit A). Mr. Bender testified that this was to reimburse him for "refrigerators."

None of the Schedules corroborate that Mr. Bender's contributions to the companies are treated as "loans." None of the Schedules show the "hundreds of thousands of dollars" in expense reimbursements owed to Mr. Bender, that he assured the court would be in the books to support the periodic lump sum payments made to him that appear on the bank statements. None of the Schedules provide information on transfers between companies or detail the other accounts receivable. Mr. Bender did not know what would be included in the intercompany receivables or

the non-insider accounts receivable. Mr. Bender testified that, "We can get you a list," but the court agrees with counsel that the Schedules are supposed to *be* "the list." When asked whether he inquired as to what some of the entries entailed, Mr. Bender said, "Why would I ask?"

**The Debtors' Proposed Path to Reorganization and Postpetition Conduct**

At the October 2024 Hearing, in an effort to show a likelihood of successful reorganization, the Debtors presented a non-binding letter of intent from Red Fox Capital (the LOI), Ex. I, which was admitted into evidence for the limited purpose of showing that the LOI had been received. Mr. Bender testified about his understanding of the proposed transaction, which would, in the form of either a loan or investment, pay the M&T mortgage on the Illinois parks in full, as well as the chattel loans on the manufactured homes located in the Illinois parks, and would pay the Toppos Trustee for the unencumbered, Toppos-owned manufactured homes located in the Illinois parks at a negotiated purchase price. The transaction further anticipated a post-bankruptcy sale of the parks, with Red Fox and Mr. Bender (as the shareholders of the park entities) sharing equally the net proceeds after the Red Fox loan repayment. While the Debtors painted this potential transaction as "paying the creditors in full," it was clear from Mr. Bender's testimony that only three creditors would be paid at all from that transaction: M&T, the creditor secured by the real property in Illinois, would be paid in full; 21st Mortgage, the creditor secured by the manufactured homes in the Illinois parks, would be paid "in full," but only for the mobile home collateral at those parks; and Toppos would be paid some amount for the unencumbered homes in those parks. While Mr. Bender did not distinguish between secured and unsecured creditors, it is evident that the transaction would not meaningfully result in any distribution to unsecured creditors.

Mr. Bender testified that he has tried to sell these parks in the past but that the lenders would not agree to the proposed sale terms. Mr. Bircher testified that, as Toppos Trustee, he tried

to negotiate sales but was unsuccessful because he had control of only one part of the enterprise: he could not persuade the secured lenders to "take a haircut" or persuade Mr. Bender to take less than he hoped to get out of the properties. That was the basis, in part, for the motion to substantively consolidate all of the affiliates, which would bring all of the affiliate entities under the control of the Toppos Trustee so that he could negotiate with all the potential buyers in a cohesive way. Based on the evidence, the court is doubtful that an acceptable transaction could be negotiated and approved with Mr. Bender in control of the Debtors, weighing strongly in favor of allowing the motion now before the court.

Mr. Bender also testified about a set of parks in Illinois remaining under Top Park management after negotiations with GreenState Credit Union. In those parks, occupancy has been increased to 90 percent, rents have been raised, and the parks are profitable. Mr. Bender contends that their success demonstrates that the Debtors also can be successfully rehabilitated. However, the court has no detail about how those parks are operating, including whether there are Toppos-owned mobile homes in those parks for which rent has or has not been paid. Notably, GreenState did not oppose the motion to appoint a trustee for Top Park, which will impact the operations of these non-debtor parks.

Finally, the Debtors focus on their stated intent to closely follow the rules of the bankruptcy court, noting that they have not even spent the funds authorized to be used under the cash collateral orders. When questioned whether he would operate the company as a debtor-in-possession the way it was operated prepetition, Mr. Bender first testified that "I will continue to operate the way we're operating now, and hopefully [...] will very soon present a plan that will take care of the [creditors] and everything." Upon further questioning, Mr. Bender said, "I'm doing my very best to follow every rule of the bankruptcy court and make sure everybody's approved ... you know, I haven't

made a single payment to anyone to make sure we do everything right. So I plan to follow all the rules of the court to the best of my ability, so no, it will not be the same process we used for anything, for paying bills, for paying employees, for anything [...] I plan to follow all those rules."

The court credits the Debtors with their stated intent to comply with the bankruptcy laws and rules. Unfortunately, in the larger context, it is simply not enough, particularly in view of the substantial information that was not provided with the Schedules, including any information on payments made to Mr. Bender in the year prior to the petition date and identification of what claims exist between the affiliates.

## ANALYSIS AND CONCLUSIONS OF LAW

Northpoint first sought conversion of the cases to cases under chapter 7, and appointment of a trustee in the alternative. The court determines in its discretion that in this case, and considering the history of Toppos with this court, appointment of a trustee is the better alternative. Conversion predetermines a number of issues that are better suited for an informed, neutral analysis, including whether to try to formulate and confirm a plan[15] (even if that plan is a liquidating plan), whether to continue to seek substantive consolidation of the cases (and, if applicable, any non-debtor affiliates), and ultimately whether to convert these cases to chapter 7 or, if there is a reason to do so, to reconvert Toppos to a chapter 11 case. Accordingly, the motion to convert is denied.

With respect to the alternate motion, the court has reviewed the evidence against the standards for appointment of a chapter 11 trustee either for cause or in the interests of the creditors

---

[15] Appointment of a trustee does not preclude pursuit of a transaction similar to the one the Debtors were negotiating with Red Fox, and, in fact, may make it more likely that such a transaction could be achieved and approved by the court.

and the estate. In this case, the court concludes that appointment of a trustee is necessary under either standard.

### Appointment of a Trustee for Cause

As set forth above, § 1104(a)(1) provides for the appointment of a trustee for cause. "Cause" may include fraud or gross mismanagement, but cause has also been found to exist where the continuation of the debtor's management results in potential conflicts of interest between the debtor and affiliated entities. *In re IPofA W. Oaks Mall, LP*, No. 07-33649-KRH, 2007 WL 3223295, at *3 (Bankr. E.D. Va. Oct. 29, 2007). Moreover, a debtor in possession is a fiduciary of the estate, and a trustee should be appointed when the debtor in possession cannot perform its fiduciary duties. *Id.* at *3-4.  Those duties include a duty of care to protect the debtor's assets, and a duty of loyalty to avoid self-dealing, conflicts of interest, and the appearance of impropriety. *Eurospark*, 424 B.R. at 627. Fiduciary obligations of a debtor in possession also include open, honest, and straightforward disclosure to the court and creditors. *See Marvel*, 140 F.3d at 474.

Here, the court finds that the interrelationship between all of the affiliates, as controlled by one individual who has a substantial financial interest in being repaid for his investment, precludes the ability to manage all of the Debtors while maintaining a fiduciary duty to all of the estates. Advancing funds through the "due to/due from" process from the Park Debtors while the M&T debt went unpaid violated the fiduciary obligation of management to pay down the Park Debtors' debt rather than siphon their funds to operate the affiliates, keep Top Park afloat, and "repay" Mr. Bender.  The integrated cash management system enabled Top Park to use the income of one entity to pay the operational expenses of another, leaving all of the entities undercapitalized to meet their own obligations. Even with model management, those facts alone are enough to warrant the appointment of a trustee. Here, the Debtors do not have model management.

31

Mr. Bender has 40 years of business experience. At a minimum, he should know whether there are promissory notes to document that the $40,000,000 he invested in the companies are loans and not capital, the difference between a loan repayment and a distribution, and whether the life insurance being paid for by Time Out is "key man" life insurance or a personal policy. Not only did Mr. Bender testify that he does not know these things, it was readily apparent that he does not seem to *care* that he does not know, as he indicated no interest in finding out. His taking distributions of $25 million when the affiliate companies were unable to meet their operational expenses, never mind fund their debt, demonstrates at the very least poor business judgment.

Mr. Bender's failure to take the time to ensure the accuracy of the Schedules – and more than that, his lack of interest or regard for their accuracy – likewise demonstrates that Mr. Bender should not be left in control of the chapter 11 Debtors. Mr. Bender has been involved in the chapter 11 process for a year, has testified at several hearings, and should be aware of what kinds of questions will be asked of him. Again, rather than inform himself of the answers, he simply stated that he did not know. He expressed indignance when pressed for details on even the most basic (and essential) of topics, and refused to provide the court with straightforward testimony or helpful information. Sometimes, following his constant response of "I don't know," he would add "but we can get you that information." But the Debtors – like Toppos before them – never proffered a person to provide that information.

On the topic of the distributions paid to Mr. Bender in 2021 and 2022, the court recognizes that of course business owners hope to be repaid their capital contributions and loans and to eventually receive profits for their equity interests. But operations and opportunities are financed by creditors, and creditors must be repaid before equity. That is not what has happened here. There was no evidence detailing any distributions in 2023 and 2024, but in 2021 and 2022, at the height

32

of Covid and the eviction moratoria and limited rental revenue, a *net* payment of well over $7 million was made to Mr. Bender. Whether or not M&T knew that part of its financing would be paid to Mr. Bender as repayment for his initial purchase of the Debtor Parks (as Mr. Bender testified), other creditors have been left holding the (empty) bag. The Debtor Parks could not operate without the mobile homes they lease to tenants. Yet the mobile home lenders and the mobile home owner, Toppos, have gone unpaid, just as the maintenance expenses have been shifted over to Toppos with no corresponding revenue. All of this constitutes mismanagement and irreconcilable conflicts that support the appointment of a trustee, and the court concludes, based on clear and convincing evidence, that there is cause to appoint a trustee under § 1104(a)(1).

### Appointment of a Trustee in the Interest of Creditors and the Estate

A separate statutory ground for appointment of a trustee is set forth in § 1104(a)(2), which provides for the appointment of a trustee when that appointment is in the interest of creditors and the estate. A finding of fault on the part of the debtor is not required to appoint a chapter 11 trustee under § 1104(a)(2). *Eurospark* 424 B.R. at 627. Instead, courts consider a range of factors under § 1104(a)(2), which are:

(i) the trustworthiness of the debtor;

(ii) the debtor in possession's past and present performance;

(iii) prospects for the debtor's rehabilitation;

(iv) the confidence, or lack thereof, of creditors in present management; and

(v) the benefits of appointing a trustee balanced against the costs.

*Id.* Appointment of a chapter 11 trustee is proper under § 1104(a)(2) where prospects for successful rehabilitation are extremely remote, *L.S. Good*, 8 B.R. at 314, and where the court finds the debtor

in possession to be someone who would "work at odds with the reorganization process at each and every turn." *See Petit v. New England Mortg. Servs. Inc.*, 182 B.R. 64, 70 (D. Me. 1995).

Here, all of the participating creditors, which include the Toppos estate through its trustee, support the appointment of a trustee. No party, other than the Debtors, filed a response or appeared at the hearing in support of the Debtors remaining in possession of the estates. The reason for this is clear from the evidence: None of the creditors have confidence in Mr. Bender's ability to fulfill his fiduciary duty to the estate based on his history of paying himself first, coupled with his inability to answer questions about the financial workings of the Debtors. Viewed against the factors articulated by the *Eurospark* court, the evidence weighs firmly in support of appointing a trustee.

<u>Trustworthiness of the Debtors and Past Performance</u>

The court finds that the lack of credibility of some of Mr. Bender's testimony demonstrates that he cannot be trusted to remain in control of the Debtors through the chapter 11 process. For example, he suggested that the reason new homes were not set for occupancy was because the Toppos Trustee instructed Top Park management not to lease vacant homes, but Mr. Shapiro's photos demonstrate that new homes were not being maintained/set up before the Toppos Trustee was ever appointed. The Toppos Trustee testified that there was no discussion at all about not leasing homes until 21st Mortgage had stay relief, which was in April 2024, and even then the instruction not to lease homes was limited. The consent order reflecting the agreement corroborates that re-leasing vacant homes was contemplated, in consultation with the Toppos Trustee. Portraying Top Park as being essentially handcuffed is simply not credible.

Mr. Bender also referenced in his testimony Toppos's intent to reorganize, but Toppos always contemplated selling all of the parks and homes together, which was laid out during the

Toppos first day hearings. Mr. Bender also testified, with respect to the eve-of-Toppos-bankruptcy amended agreements, that the parks could no longer pay for maintenance and so, with the advice of counsel, they decided to shift the maintenance costs to Toppos. In the same sentence, Mr. Bender testified that they decided to memorialize what the entities were "currently doing." They either changed what they were doing, or they documented what they had been doing historically. Mr. Bender was inconsistent about which it was, because the documents, including the profit and loss statements, did not support his testimony that they were simply documenting how they had been operating.

Lack of transparency also goes to the trustworthiness of the Debtors. As detailed above, the answer to many key questions was "I don't know." Some answers were qualified with "but we can certainly get you that information." When asked about the Schedules, Mr. Bender stated that he had not asked any questions about the information in the Schedules, and he could not seem to understand why anyone thought he should have asked. Mr. Bender signed those Schedules under penalty of perjury and is asking this court to allow him to continue managing the Debtors, but he expressed no interest in understanding what the multi-million dollar figures represented. Given that Mr. Bender has been engaged in the bankruptcy process for over a year, having testified in several hearings in the Toppos case and at no fewer than two 341 meetings, the court finds this extremely concerning. The type of information sought by the BA and creditors is the same. To suggest surprise at the information requested or the questions asked is not credible. To have failed to inform himself of the answers is, in the court's view, a decision to willfully be unable to answer them.

With respect to past performance, in addition to all of the evidence recited above regarding the Debtors' accounting practices and failure to service debt, the Debtors also operate in a manner

that increases expenses and fails to serve the residential tenants. There appears to be no management on site, and Mr. Bender testified that the director of maintenance lives in Miami, Florida.[16] There was little evidence related to the impact of the absentee management on the tenants, who are also interested parties in the cases of the Park Debtors, but the failure to maintain half of the homes in occupiable condition (as testified to by Mr. Shapiro) must impact the living conditions of the residents on site.

Prospects for Rehabilitation

With respect to the prospects for the Debtors' rehabilitation, the Debtors' proffered path to reorganization in this case is to pay some of the secured creditors, discharge the obligation to the unsecured creditors with little to no return (this is evident from the description of the transaction, notwithstanding that Mr. Bender did not use the specific term "unsecured creditor"), and leave Mr. Bender in a position to recover substantial equity within 12-18 months. Notably, no one other than the Debtors provided evidence or argument in support of any leaving the Debtors in control to attempt to reorganize.

The court also credits Mr. Bircher's testimony that the ability to negotiate a realistic sale is hampered by the involvement of Mr. Bender, as his personal interest in seeing some return on equity of necessity impacts his ability to evaluate the best transaction *for the Debtors and their estates*. From the beginning of even the Toppos case, all parties, including Toppos, knew that selling the parks and mobile homes together was the best way to maximize proceeds and pay creditors. Mr. Bircher has already worked with the "dirt lenders" for those parks where the real estate value was less than the debt, but for those parks that could sell for enough to satisfy the real

---

[16] The travel expenses on the bank statements and profit and loss statements demonstrate that having remote management staff is costly. From June 2023 through September 2024, Top Park's profit and loss shows $355,600 in "Travel and Entertainment" expenses, most of which is attributable to domestic air travel. Ex. A at 5. In some months, Top Park incurred upwards of $20,000 in flight expenses. *Id.*

estate and chattel lenders, sales have fallen through because of the conflicted interests of management and the secured lenders. Mr. Bircher testified that this was "nobody's fault," but the reality is that as long as the current management structure remains at the wheel, the sales process will be hopelessly paralyzed.

Reorganization would also require investigation and recovery of avoidable transfers. The court acknowledges that the transfers to Mr. Bender may or may not be avoidable. However, if they are, Mr. Bender testified that while of course those transfers would be investigated, any recovery from him would be from the profit from the Illinois parks – in other words, recovery from him would depend on his getting equity out of the Debtor Parks and other Illinois parks that remain under Top Park control. This entirely misses the point of the avoidance and recovery procedures, which is to re-infuse the transferred funds into the Debtors. In short, the commitment to investigate insider transactions would have no significant effect on the Debtors' reorganization.

<u>Confidence of Creditors in Present Management</u>

The creditors have made it clear that they have no confidence in the present management. As noted above, all participating creditors, including the Toppos estate, support the appointment of a trustee. All creditors expressed concern about the payments to Mr. Bender while the condition of the affiliates and their property deteriorated and while taxes and mortgage debt went unpaid. It was readily apparent in December 2023, when Northpoint sought appointment of a trustee in Toppos, that there existed a pronounced level of skepticism verging on distrust as between the secured creditors on one side, and Toppos and Mr. Bender on the other. Northpoint's position was initially articulated at the first hearing in the Toppos case over one year ago, at which it expressed disbelief at the fact of the change in the lease agreements to the detriment of Toppos literally the day before Toppos filed its bankruptcy petition. Whether or not that agreement was changed with

the motive to undercut Toppos, Mr. Bender admitted that it was amended without any consideration of the financial ability of Toppos to meet the new obligations.

In addition, Mr. Bender's operational choices do not instill the confidence of creditors. With hundreds of millions of dollars in debt, the differences between a loan, a contribution, a loan repayment, and an equity distribution matter greatly. The use of revenue for one affiliate entity to pay the operating costs of another, accounted for by simply "due to" and "due from" ledger entries, does little to comfort lenders that are owed money from the entities advancing the costs of other entities. That practice could be a dubious accounting maneuver in any context and here, with so many different entities with so many operational costs and multiple separate lenders, it is untenable. Overarching all that is the fact that at the end of the day, no matter how accurate the accounting system may be, the standard operating procedure is to leave the creditors unpaid.

It was plain to the court after two days of testimony that while Mr. Bender's business acumen may have served him well in other business contexts and quite likely also in the earlier stages of the Debtors' operations, his interests now are not aligned with those of the Debtors, and that requires immediate remediation.

<u>Benefits of Appointing a Trustee Weighed Against the Costs</u>

The court is also to consider the benefits of appointing a trustee weighed against the costs of an appointment. Mr. Bircher has been in place as the Toppos Trustee since December 12, 2023, and has not only developed an operational understanding of all the affiliated Debtors and the parks that remain outside bankruptcy, but also has built relationships with potential purchasers and the secured creditors. He testified that with those relationships, he believes he can negotiate sales that will benefit the secured creditors and the estates. While the court believes that expectation to be entirely accurate and reasonable, the court also can foresee circumstances where appointing the

same trustee for all of the Debtors – and Toppos – potentially could create some conflicts between the estates. For that reason, the court accepts the BA's recommendation to appoint Mr. Bircher as interim trustee, which will give all of the parties an opportunity to evaluate whether separate trustees are needed for one or more of the Debtors. Considering all of the circumstances of this multifaceted operation, the court finds that the benefits of having independent fiduciaries in place, even if more than one is needed, outweigh the administrative cost that may be incurred.

In short, the court finds that all of the factors identified in *Eurospark* weigh in only one direction: the appointment of a trustee. The court concludes, based on clear and convincing evidence, that the appointment of a trustee is in the interest of creditors and the estate as contemplated by § 1104(a)(2).

## CONCLUSION

For the reasons set forth above, the court finds that Northpoint, as joined by the Toppos Trustee and M&T, has met its burden of proving by clear and convincing evidence that appointment of a chapter 11 trustee is appropriate in all five of these cases both for cause and, separately, on grounds that appointment of a trustee is in the best interest of creditors and the estates pursuant to 11 U.S.C. § 1104(a)(1) and (2). Confirming the order entered on October 25, 2024, John C. Bircher III is appointed interim chapter 11 trustee, and Mr. Bircher, the BA, and the parties are directed to assess whether the operational structure mandates the appointment of a different trustee for any or all of these Debtors to maintain neutrality and meet the fiduciary obligations to each estate. Absent a request for appointment of a different trustee or for additional time to assess the issue, the court will make Mr. Bircher's appointment permanent on December 15, 2024.

## END OF DOCUMENT